UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C. DAVID STOKES,
    Plaintiff

V.

CIGNA GROUP INSURANCE COMPANY
OF AMERICA, CONNECTICUT GENERAL
LIFE INSURANCE COMPANY, AND PRICE
WATERHOUSE LONG TERM DISABILITY
PLAN,

    Defendants

FILING FEE PAID:
RECEIPT # 505 76
AMOUNT $_____
BY DPTY CLK_____
DATE_____

CIVIL ACTION NO.

04 ___ ___ ___ ___

MAGISTRATE JUDGE Alexander

## COMPLAINT

### INTRODUCTION

1.     Plaintiff, C. David Stokes ("Mr. Stokes"), brings this action against Defendants,

    Cigna Group Insurance Company of America ("Cigna"), Connecticut General

    Life Insurance Company ("Connecticut General") and the Price Waterhouse

    Group Long Term Disability ("Plan"), for violation of the Employment

    Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 *et. seq.*

    ("ERISA"). Mr. Stokes is a participant in the Plan, an ERISA welfare benefit plan

    whose claims administration is handled by Connecticut General. The Plan is fully

    insured by a policy of insurance issued by Connecticut General. The Plan number

    is 503, and the Policy number is 303220-02.

2.     This Complaint challenges the Defendants': 1) unreasonable and unlawful denial

    of Mr. Stokes's long term disability ("LTD") income benefits despite the

substantial medical evidence demonstrating Mr. Stokes's qualifications for said benefits; 2) pattern of rejecting and/or ignoring the substantial evidence supporting Mr. Stokes' total disability pursuant to the terms of the Plan; 3) failure to provide Mr. Stokes with a full and fair review of his claim; and 4) failure to provide a reasonable claims procedure that would yield a decision on the merits of Mr. Stokes' claim.

3.      Mr. Stokes is filing this action to recover benefits due under the Plan, to enforce the present rights existing therein, to clarify rights under the terms of the Plan, and to recover costs and attorneys' fees as provided by ERISA.

## JURISDICTION

4.      This court has personal and subject matter jurisdiction over this case under 29 U.S.C. § 1132(e)(2) and (f), without regard to jurisdictional amount or diversity of citizenship, in that the Plan is administered in this district.

## PARTIES

5.      Mr. Stokes is a 41-year-old individual who currently resides in Boston, Massachusetts. Mr. Stokes is a vested participant in an employee benefit plan, within the meaning of 29 U.S.C. § 1002(2)(7). Mr. Stokes has standing to bring this action under 29 U.S.C. § 1132(a).

6.      The defendant, Cigna, is a for-profit corporation with its principal place of business at 12225 Greenville Ave, Suite 1000, Dallas, Texas 75243. Cigna transacts business in Massachusetts.

7.      The defendant, Connecticut General is a subsidiary of CIGNA Corporation, with its principal place of business in Bloomfield, Connecticut. Connecticut General

transacts business in Massachusetts and insures and administers the Plan under which Mr. Stokes is suing. Connecticut General is the party responsible for processing claims made under the Plan and making a final determination as to Plan participants' eligibility for LTD benefits.

8.    At all times relevant to the claims asserted in this Complaint, Connecticut General purported to act as an ERISA claims fiduciary with respect to participants of the Plan, generally, and specifically, with respect to Mr. Stokes, within the meaning of ERISA.

9.    The Plan under which Mr. Stokes is suing is a "long -term disability plan" issued by Connecticut General to Price Waterhouse, a for-profit company with its principal place of business in New York, New York.   The Group Plan Number is 503, and the policy number is 303220-02.

## STATEMENT OF FACTS

### Insurance Entitlement, Definitions of Disability, Discretion

10.    At the time he became disabled with as a result of HIV/AIDS, Mr. Stokes was Senior Manager of the Litigation Consulting Group at Price Waterhouse in Boston, Massachusetts.

11.    Mr. Stokes became at Senior Manager at age 30.  Mr. Stokes was among the youngest senior managers at Price Waterhouse.

12.    As an employee of Price Waterhouse, Mr. Stokes was entitled to LTD benefits, under a contract of insurance between Price Waterhouse and Connecticut General.

13.    Connecticut General both funds and administers the Plan under which Mr. Stokes is suing.

14.   Under the terms of the Plan, Price Waterhouse does not have discretionary
      authority to determine a claimant's eligibility for LTD benefits and to interpret the
      terms and provisions of the Plan.

15.   Under the terms of the Plan, neither CIGNA nor Connecticut General has
      discretionary authority to determine a claimant's eligibility for LTD benefits and
      to interpret the terms and provisions of the Plan.

16.   Under the terms of the Plan, Mr. Stokes is entitled to receive 60% of his monthly
      earnings until he turns 65 years old.

17.   Under the terms of the Plan, "Disability" and "disabled" are defined as follows:

      **Total Disability or Totally Disabled**
      **(For Long Term Disability Insurance)**

      You will be considered Totally Disabled, if because of an Injury or
      Sickness, you are unable to perform the essential duties of your
      occupation.

      After Monthly Benefits have been payable for 60 months, you will be
      considered Totally Disabled only if, because of Injury or Sickness, you are
      unable to perform the essential duties of any occupation for which you are
      of may reasonably become qualified based on your education, training or
      experience.

18.   The Plan defines "Sickness" as: "The term Sickness means a physical or mental
      illness. It also includes pregnancy."

19.   Except for the terms defined above, the Plan contains no other definition or
      explanation for the term "disability."

**Mr. Stokes's Claim for LTD Benefits**

20.   Mr. Stokes has presented a timely claim to Connecticut General, asserting that he
      is an insured person, that he became totally disabled while insured, and that he is

4

entitled under the Plan to LTD benefits for the period of time beginning in

September 1, 2003, when Connecticut General wrongfully terminated his benefits,

and continuing thereafter without interruption through to the present, and

continuing in the future until he reaches the age of 65 or is no longer disabled.

## Diagnosis of HIV/AIDS and Application for LTD Benefits

21.    Mr. Stokes first detected symptoms of HIV in 1990. At that time, finding out one

was HIV positive was an almost assured death sentence.

22.    Mr. Stokes' first CD4 T-cell count was in the low 200s. As a result, Mr. Stokes

agreed to seek specialized medical attention.

23.    In 1990, Mr. Stokes began seeing Dr. Calvin Cohen, an internationally-recognized

HIV/AIDS expert and the head of the Community Research Initiative of New

England.

24.    Dr. Cohen immediately placed Mr. Stokes on AZT therapy. While the medication

made Mr. Stokes nauseated and gave him other bad side effects, Mr. Stokes

continued working. For several years, Mr. Stokes rose quickly within the ranks of

Price Waterhouse. During this time, he was on several different medical regimens

and in a few clinical trials to try to keep his HIV/AIDS at bay, but it simply was

not enough. His health was worsening.

25.    By 1994, Mr. Stokes was suffering from severe headaches and night sweats.

After much discussion and persuasion from Dr. Cohen as well as Mr. Stokes'

close friends and family, Mr. Stokes decided to take a short term break from work

to try to regain his strength.

26.    Unfortunately, Mr. Stokes never regained enough consistent strength to return to

work in any meaningful capacity. Ongoing fatigue, headaches, night sweats, diarrhea, neuropathy, cognitive deficits and other symptoms have prevented Mr. Stokes from being able to sustain any activity for any period of time long enough to enable him to work. However, Mr. Stokes has been able to survive with AIDS, a testament to his strong willed spirit and determination to survive.

27.    Mr. Stokes continues to suffer from the debilitating symptoms of HIV/AIDS to this day.

28.    Since the onset of his illness, Mr. Stokes has participated six clinical research trials at the Community Research Initiative of New England. For example, in 1996, Mr. Stokes was one of twelve individuals who participated in an experimental double-protease inhibitor trial. As a part of this trial, Mr. Stokes endured numerous spinal taps in order to prove that protease inhibitors crossed the blood-brain barrier and reduced HIV-viral load in the brain stem. The results of this study were presented at the Vancouver AIDS Conference.

29.    The most recent research trial in which Mr. Stokes has participated was known as a "FOTO" trial (Five days On, Two days Off). In this trial Mr. Stokes was required to take a powerful combination of medications for five days and then take two days off to see if the medications were powerful enough to maintain sufficient drug levels. The hope is that by giving the body two days off per week, the levels of toxicity in the bloodstream and liver will be lowered without sacrificing efficacy as evidenced by viral load suppression.

30.    To date, the only manner in which Mr. Stokes has been able to access new drugs in order to survive has been through clinical research trials.

31.   In November 1999, Mr. Stokes' condition was further compromised by Congestive Heart Failure and Idiopathic Cardiomyopathy. Mr. Stokes had an ejection fraction of 15%. He was severely exhausted, had difficulty breathing, and could not fully care for himself for months. Because the more immediate concern was over Mr. Stokes' heart function, and the overall consensus of the doctors was that they did not know the cause of his Cardiomyopathy, Mr. Stokes was taken off his HIV medications, as they were considered the most likely culprit.

32.   Within nine months, Mr. Stokes' T Helper Cells dropped to approximately 90 and his viral load spiked upward. Mr. Stokes was officially diagnosed with AIDS. In addition, it was necessary for Mr. Stokes to go through an FDA expanded access program in order to secure Tenafovir, an as yet unapproved anti-retroviral drug, in order to have an adequate combination therapy that was not as potentially damaging to his heart and one to which his HIV virus had not already developed resistance. Mr. Stokes was also undergoing monthly Pentanamine treatments as a prophylaxis for Pneumosystis Pneumonia.

33.   Throughout this period (and long before), Mr. Stokes had been enduring daily chronic migraine and cluster headaches, debilitating fatigue, night sweats and difficulty concentrating. Sleeping twelve hours per night with frequent naps throughout the day was the norm for Mr. Stokes

34.   From 2002 to 2003, Mr. Stokes' heart condition stabilized, but his migraines, fatigue and overall weakness continued.

35.   During the past few years, Mr. Stokes has been in a difficult medical situation. In

particular, the treatments Mr. Stokes has attempted to address headache and fatigue issues put a strain on and are bad for his heart. In fact, in order to try to prevent the intense cluster/migraine headaches that often sent him to the hospital emergency room or to urgent care for shots of Percodan and anti-nausea medicine, Mr. Stokes was prescribed ever-increasing doses of Percocet to blunt the pain and prevent the possibility of these devastating headaches. This medication worsened his fatigue.

36.    Battling fatigue caused it own problems for Mr. Stokes. Any treatment for fatigue, whether a prescribed stimulant or simply a cup of coffee, is dangerous for him as it goes directly against the effect of the prescribed heart medications he continues to take to keep his Cardiomyopathy in check.

37.    During the summer of 2002, it became apparent to Mr. Stokes that the only way he would regain any real strength and gain control over his debilitating fatigue was to focus on improving his heart function (and presumably his energy level) through controlled exercise. Accordingly, under the advice and guidance of his cardiologist, Mr. Stokes began working with a trainer (who had experience with AIDS and heart patients) for 30-minute sessions twice a week at a local gym to regain muscle strength and to have a controlled environment for cardiovascular exercise.

38.    During this time, Dr. Cohen checked Mr. Stokes' testosterone level and found that it was low. In an effort to boost his energy, help him rebuild muscle, improve depression, and regain weight, Mr. Stokes began testosterone injections. Over the course of the next year, Mr. Stokes' strength improved to the point of being able

to use light weight on resistance machines, use the treadmill and the elliptical machine. In addition, Mr. Stokes' weight increased from 125 to about 138 pounds.

39.    The trainer Mr. Stokes worked with was as flexible as possible with her time schedule because it was very difficult for Mr. Stokes to keep a regularly scheduled appointment or to know when he would feel well enough to go to the gym. There were certainly short periods – perhaps even a few days at a time – when he felt better and more alert, but there was no consistency to his energy level.

40.    Mr. Stokes continues to suffer from the debilitating side-effects from the combination of anti-retrovirals he takes to attempt to limit the progression of his disease. These side-effects include, but are not limited to, persistent diarrhea, gastrointestinal problems, neuropathy, cognitive limitations, nausea and fatigue.

41.    It is also important to note that since Mr. Stokes began taking AZT in 1991, he has either used all available anti-retroviral drugs in some combination, have developed cross-resistance to others in the same class, or have experienced side effects that make these drugs intolerable for him.

42.    For his headaches, Mr. Stokes receives Botox injections and takes pain killers including Methadone, Topomax and Percocet.

**Application for LTD Benefits**

43.    On March 10, 1995, Mr. Stokes filed his application for LTD benefits with Connecticut General.

44.    On May 12, 1995, Connecticut General approved Mr. Stokes's application for

benefits.

45.  Mr. Stokes received LTD benefits from Connecticut General, and later CIGNA, until September 2003.

## CIGNA's Investigation of Mr. Stokes' Claim for Benefits

46.  On September 12, 2002, CIGNA received a fax from Susan B. Gross, LICSW, regarding Mr. Stokes. The reference on the fax was detailed as "fraud."

47.  It appears from the fax that Ms. Gross had been corresponding with an individual at CIGNA named "Jeff" regarding Mr. Stokes' activities. In her fax, Ms. Gross falsely claimed that Mr. Stokes was performing "some sort of consulting job for a company called Sweet Productions on Long Island."

     Ms. Gross also made five other allegations:

     1.  Mr. Stokes was a partner in a restaurant called Blackstones on the Square;

     2.  Mr. Stokes "has bought, developed and sold properties" in Boston, which earn investment income;

     3.  Mr. Stokes has "developed an (sic) ran a business (501(c)(3) called the Boston Buyer's Club;

     4.  "In the mid to late 1990s he was campaign chairman for Mark Walsh who ran for state representative"; and

     5.  A lawyer helped Mr. Stokes with his real estate transactions.

48.  Ms. Gross concluded her fax as follows:

     I would prefer not to be contacted any further. I think that this is more than enough information for you to look into if you so choose.

49.  In response to this fax, CIGNA requested an investigation of Mr. Stokes, including but not limited to surveillance of Mr. Stokes and his activities.

50.  An investigation was conducted on October 22, 2002 and October 30, 2002, and

revealed that Mr. Stokes did not engage in any activity during the week of October 22, 2002, and was confirmed at home on at least one other occasion, on October 28, 2002.

51.    In December 2002, CIGNA scheduled an independent medical evaluation for Mr. Stokes with John L. Brusch, M.D., Associate Chief of Medicine, Cambridge Health Alliance, the Chief of Medicine at Somerville Hospital and the Medical Director of Hutchins Transitional Care Unit.  Dr. Brusch is also board-certified in internal medicine with a sub-specialty certificate in Infectious Disease, and is a professor at Harvard Medical School.

52.    After examining Mr. Stokes, Dr. Brusch concluded that: "Mr. David Stokes is permanently disabled because of AIDS with the significant complication of cardiomyopathy with attendant fatigue and impairments of concentration and executive functioning, as well as debilitating uncontrolled migraine headaches. I base this conclusion on physical examination (findings of cardiomegaly and impaired left ventricular functioning as well as hypotension); laboratory evaluation (Echocardiogram and HIV serology) and history obtained directly from the patient as well as by his medical records."

53.    On December 17, 2002 and December 18, 2002, CIGNA again ordered additional surveillance of Mr. Stokes.  On December 17, 2002, the investigators, according to their report, saw Mr. Stokes travel "to Cambridge Hospital, Harvard Vanguard Medical Facility, a McDonald's restaurant, a Brooks pharmacy, a Fleet Bank, a FedEx store, a Skipton pet supply store, and a P.J.'s Pet Center." According to the investigation report, Mr. Stokes remained home on December 18, 2002.

54.    On January 8, 2003, the CIGNA Special Investigation Unit (SIU) rendered a report of its investigation into Mr. Stokes' earnings. Mr. Stokes' claim handler had referred Mr. Stokes' claim to the SIU "for a FICA check on September 26, 2002." According to this report, Mr. Stokes did not report any non-FICA earnings from 1995 through 2001.

55.    On January 23, 2003, CIGNA retained Crawford Investigation Services to again conduct an investigation of Mr. Stokes claim. On this occasion, Crawford was retained to conduct "a search of all public records associated with the Subject at the Secretary of the Commonwealth's office . . ." The investigator obtained business summaries and articles of organization for Boston Buyer's Club and the Historic Renovation Company, LLC.

56.    Additional surveillance of Mr. Stokes was conducted on March 26, 2003 and March 27, 2003. The surveillance video for the March 26, 2003 surveillance was disclosed to Mr. Stokes, but no tape was disclosed for the March 27, 2003 surveillance, despite ERISA's requirement that all relevant information be disclosed to claimants upon request.

57.    On April 16, 2003, the SIU rendered another report regarding Mr. Stokes' claim. The report stated:

> The claimant is involved with two self-employed businesses for sure and a possible third as a consultant for Sweet Productions in Amityville, NY. No earnings were found in a FICA check; therefore he is probably hiding the income somewhere. The surveillance will be monitored very closely. If the surveillance does not pan out, then an (sic) FCE may be the best option.
>
> Surveillance was conducted on March 26, 2003. The claimant was verified to be out of town in New York. Surveillance was suspended for the day. It was speculated that the claimant may be in Amityville, NY

working at Sweet Productions.  On March 27, 2003, an investigator conducted surveillance at Sweet Productions.  At no time on this day was the claimant observed at the Sweet Productions plant.

58.    On June 12, 2003, CIGNA faxed Millie Rodriguez at Sweet Productions requesting information regarding Mr. Stokes' employment at her organization.

59.    On June 13, 2003, Sweet Productions confirmed that Mr. Stokes did not work at Sweet Productions.

60.    On July 14, 2003, Dr. Cohen responded to CIGNA's request for an updated Attending Physician Statement and Physical Abilities Assessment Form, indicating that Mr. Stokes is unable to work at this time due to "erratic energy level."

61.    On July 21, 2003 through July 26, 2003, CIGNA requested that I.M.L. Investigations, Inc. conduct extensive surveillance of Mr. Stokes, utilizing two investigators.

62.    According to the investigation report, Mr. Stokes was seen "operating his car and staying at Sweet Productions, Inc."

63.    On August 4, 2003, CIGNA faxed Millie Rodriquez again requesting information regarding Mr. Stokes employment at Sweet Productions.

64.    On August 6, 2003, Millie Rodriquez verified that Mr. Stokes "is not currently performing, nor has he ever performed, any contract and/or consulting work for Sweet Productions."

65.    On August 8, 2003, a CIGNA physician conducted a review of Mr. Stokes' file finding that Mr. Stokes' symptoms "are clearly not valid given the long hours of sustained hours on multiple consecutive days."

66.   On August 13, 2003, the SIU rendered a follow-up report on the surveillance of

      Mr. Stokes in July 2003. This report indicated as follows:

      . . . The surveillance was conducted to prove that the claimant is working
      at Sweet Productions in Long Island, NY and determine his daily
      functionality. Two tips were received that the claimant was working at
      Sweet Productions. . . .

67.   Mr. Stokes is not currently, nor has he ever, worked at Sweet Productions.

68.   Mr. Stokes is not currently, nor has he since the onset of his disability, engaged in

      full-or part-time work for wage or profit or for free.

69.   On August 14, 2003, CIGNA sent Mr. Stokes' claim to Michael Silverman, M.D.,

      a physician in Illinois, to conduct a review of Mr. Stokes' records.

70.   On August 21, 2003, Dr. Silverman completed his report, finding that Mr. Stokes

      "is able to perform full time sedentary/light duty work, as reviewed in the video

      surveillance that clearly demonstrated his ability to function in a reasonable

      workweek."

**Termination of Mr. Stokes' Claim**

71.   On September 3, 2003, CIGNA terminated Mr. Stokes' claim on the basis of the

      July 2003 surveillance and Dr. Silverman's report. Under the section of the

      termination letter entitled "Decision Rationale," CIGNA stated:

      Although Dr. Cohen has indicated that you are unable to work due to
      fatigue and headaches, there is no clinical evidence to support his opinion.
      A medical review of your file by an infectious disease specialist has
      concluded that the medical does not support your inability to work at the
      present time. Furthermore, the surveillance of your activities clearly
      demonstrates that your activities are inconsistent with Dr. Cohen's reports
      of your impairment. We have obtained various reports of your
      involvement in several businesses, and in fact, it would appear that you are
      indeed currently working full time at Sweet Productions despite their
      reports that you are not employed with their company. Therefore, because
      the medical evidence does not support your inability to work, and you

have actually demonstrated that you are able to perform activities consistent with full time work activities, you are no longer entitled to Long Term Disability benefits. As a result, you claim has been closed.

Based on the information received, it appears that you have been receiving income which may affect the amount of your Long Term Disability payments, we ask that you provide copies of your personal tax returns, including all attachments and schedules for 2001, 2002 and 2003. Once we receive this information, we will review your benefits paid to date and notify you of any overpayment on your past benefit payments.

### Mr. Stokes' Appeal of Connecticut General's Termination of his Claim

72. On November 26, 2003, Mr. Stokes' appealed CIGNA's termination of his benefits.

73. As a part of his appeal, Mr. Stokes submitted updated medical records detailing the ongoing decline in his CD4 counts and the increase in his viral load.

74. Mr. Stokes further submitted a report from Dr. Cohen confirming Mr. Stokes' total disability.

75. Mr. Stokes also submitted a sworn affidavit to CIGNA detailing his illness, symptoms, limitations, restrictions and the fact that he has not been working in any occupation for any period of time since the onset of his disability.

76. Mr. Stokes' appeal also contained numerous affidavits supporting his inability to work as well as the fact that he is not, and has not been, working at any occupation since the onset of his disability. These affidavits further detailed the decline in Mr. Stokes' condition as well as his current limited functional ability.

77. Mr. Stokes also submitted several affidavits from employees as well as the owners of Sweet Productions detailing the fact that Mr. Stokes does not work at their facility.

78.   Mr. Stokes' appeal also included affidavits from individuals detailing the fact that
      Mr. Stokes does not work for Blackstone's on the Square, Boston Buyer's Club or
      Historic Renovation, LLC.

79.   On December 1, 2003, CIGNA wrote counsel for Mr. Stokes indicating its receipt
      of Mr. Stokes' claim for benefits.

80.   On December 4, 2003, counsel for Mr. Stokes supplemented Mr. Stokes' appeal
      with copies of Mr. Stokes' tax returns from 1998 to 2002. Mr. Stokes' tax returns
      demonstrated that Mr. Stokes has not worked for wage or profit during those
      years.

81.   On December 8, 2003, counsel for Mr. Stokes supplemented Mr. Stokes' appeal
      again, with an affidavit from Douglas Brooks attesting to Mr. Stokes' relationship
      with Ms. Gross.

82.   On December 8, 2003, Pattie Holt of CIGNA notified counsel for Mr. Stokes that
      she was in charge of managing Mr. Stokes' appeal.

83.   On December 10, 2003, counsel for Mr. Stokes supplemented Mr. Stokes' appeal
      again, submitting an affidavit from Mr. Stokes' former business partner and
      friend, Frank Ribaudo. Mr. Ribaudo's affidavit addressed CIGNA's erroneous
      allegations regarding Mr. Stokes' involvement with Blackstones on the Square
      restaurant.

84.   Again, on December 10, 2003, counsel for Mr. Stokes supplemented Mr. Stokes'
      appeal enclosing an Affidavit from Mr. Stokes' accountant regarding Mr. Stokes'
      earning and investments. In particular, this Affidavit responded to CIGNA's

erroneous conclusions regarding Boston Buyer's Club and Historic Renovation Company, LLC.

85.  On December 11, 2003, counsel for Mr. Stokes supplemented Mr. Stokes' appeal with an affidavit from a broker from Prudential Gibson Real Estate in Boston regarding Mr. Stokes.

86.  That same day, counsel for Mr. Stokes wrote Ms. Perich highlighting the inaccuracies and erroneous assumptions contained in CIGNA's October 2002 surveillance report.

87.  On December 19, 2003, counsel for Mr. Stokes supplemented Mr. Stokes' appeal with an affidavit from Paul Minichiello, a friend of Mr. Stokes.

88.  On December 21, 2003, counsel for Mr. Stokes wrote Ms. Holt enclosing a copy of all the documents submitted to Ms. Perich since the submission of Mr. Stokes' appeal, as it appeared from conversations with Ms. Holt that she was not in possession of these documents.

89.  On January 6, 2004, Ms. Holt wrote counsel for Mr. Stokes apologizing for the delay in reviewing Mr. Stokes' appeal, and requesting an additional 45 days to review the appeal.

90.  On January 20, 2004, counsel for Mr. Stokes supplemented Mr. Stokes' appeal with updated medical records from Dr. Cohen.

91.  On January 21, 2004, counsel for Mr. Stokes supplemented Mr. Stokes' appeal with an independent vocational examination conducted of Mr. Stokes by Paul Blatchford, Ed.M.  After conducting an in-person examination of Mr. Stokes utilizing standardized independent testing, Mr. Blatchford concluded that Mr.

Stokes was unable to sustain the material and substantial duties of any occupation on a full-or part-time basis.

92.     On January 26, 2004, counsel for Mr. Stokes wrote Ms. Holt informing her that Mr. Stokes' January 2004 laboratory results revealed that Mr. Stokes' CD4 count was 196, indicating a drop from his August 2003 CD4 count of 238.

93.     On January 31, 2004, Ms. Holt wrote counsel for Mr. Stokes apologizing for the delay in reviewing Mr. Stokes' appeal, and indicating that a decision would be forthcoming in 30 days.

94.     On February 20, 2004, counsel for Mr. Stokes submitted additional information to Ms. Holt regarding the impact of testosterone shots on an individual's energy level, as well as information regarding Mr. Stokes' medications and their side-effects.

95.     On March 1, 2004, Ms. Holt wrote counsel for Mr. Stokes apologizing for the delay in reviewing Mr. Stokes' appeal and indicating that a decision would be forthcoming in 30 days.

96.     On March 5, 2004, counsel for Mr. Stokes wrote Ms. Holt requesting an update on CIGNA and Connecticut General's review of Mr. Stokes' appeal.

97.     On March 10, 2004, Ms. Holt sent counsel for Mr. Stokes a fax indicating that CIGNA was "setting up a Functional Capacity Evaluation for Mr. Stokes." Ms. Holt further indicated that she was following up on a telephone message of March 9, 2004.

98.  On March 10, 2004, counsel for Mr. Stokes wrote Ms. Holt acknowledging
     receipt of her fax, and further indicating that she did not receive a telephone
     message from Ms. Holt on March 9, 2004.

99.  On March 11, 2004, counsel for Mr. Stokes wrote Ms. Holt again updating Ms.
     Holt on Mr. Stokes' blood test result. Mr. Stokes' March 2004 testing revealed
     that Mr. Stokes' CD4 count had again dropped from 196 to 160. The March 11,
     2004 further noted that Mr. Stokes' CD4 percentage dropped from 22% to 13%.

100. On March 17, 2004, counsel for Mr. Stokes supplemented Mr. Stokes' appeal
     with an updated sworn affidavit from Mr. Stokes.

101. On March 23, 2004, Ms. Holt faxed counsel for Mr. Stokes requesting a
     prescription for the Functional Capacity Evaluation ("FCE") from Dr. Cohen.

102. According to CIGNA, Dr. Cohen initially refused to write a prescription for a
     FCE for Mr. Stokes. It was Dr. Cohen's opinion that a FCE was not required to
     prove that Mr. Stokes was totally disabled.

103. On March 30, 2004, counsel for Mr. Stokes wrote Ms. Holt requesting an update
     as to CIGNA's review of Mr. Stokes' claim.

104. On April 10, 2004, Ms. Holt wrote counsel for Mr. Stokes indicating that it
     continued to wait for a copy of Dr. Cohen's prescription for the FCE.

105. On April 7, 2004, counsel for Mr. Stokes submitted a narrative from Dr. Cohen
     addressing Mr. Stokes' medical history, symptoms, limitations and restrictions.

106. In early April 2004, Dr. Stokes submitted a prescription for the FCE as requested
     by CIGNA, but noted on the prescription that Mr. Stokes should be allowed to

refuse any tests that may cause him pain or discomfort, or potentially endanger his health.

107.    On April 12, 2004, Frances McDowell of HealthSouth emailed counsel for Mr. Stokes enclosing a letter confirming Mr. Stokes' FCE.

**Functional Capacity Evaluation**

108.    On April 20, 2004 and April 21, 2004, Mr. Stokes attended the FCE accompanied by Melanie Nicholls, a nurse. Ms. Nicholl's role was to observe the FCE.

109.    The FCE was evaluated by James Marcotte, a physical therapist at HealthSouth.

110.    Mr. Marcotte noted in his FCE evaluation, in pertinent part:

> **IMPRESSION**
>
> The results of this evaluation that David Stokes physical abilities cannot be accurately quantified secondary to self limiting behaviors and inconsistencies in testing. He is functioning presently in a category consistent with a sedentary level, however I cannot determine if this is his highest functional ability. David appeared to be inconsistent during grip strength testing on both days and was limited by complaints of light headedness, for which there is no objective measure. He was observed to move slower and more deliberate on the second day of testing and his speech seemed slurred at times.

111.    Additionally, Mr. Marcotte determined that Mr. Stokes was able to sit "34-66% 2.5-5.5. hrs." in a day and to stand, walk and climb occasionally, at "1-33%" or less than 2.5 hours in a day.

112.    Mr. Stokes' limitations as outlined by Mr. Marcotte do not permit Mr. Stokes to engage in sedentary work. For example, sedentary work requires an individual to be able to sit for the majority of the work day. According to Mr. Marcotte, Mr. Stokes is only able to sit 2.5-5.5. hours in a full day.

113.    Finally, Mr. Marcotte noted:

## ENDURANCE/AEROBIC CAPACITY

. . . Comments: Client on Carvedilol and Enalapril which are both known to reduce heart rate response. Max heart rate was 93 bpm. Unable to finish treadmill test on day two due to complaint of light headedness. Stopped test one minute into stage two. Heart rate was 85 bpm with 118/80 blood pressure. Day one able to work through light headedness that again occurred in first minute of stage two.

**Dynamic Lift Testing Comments: NA**

**Positional Tolerance Comments:** Able to sit and type for 20 minutes day one before complaining of being "mentally tired". Both days c/o left leg numbness sitting at computer typing. Needed to get up and shake out left twice both times continued to type standing for one minute and then returned to seated typing. At the fourteen minute mark he stated he was "losing his place" and getting "blurry eyed". He had stated previously that he had no problem sitting on a "good day."

**Consistently Performance Summary:** 11 of 15 Consistent Tests.

Performance: ☐ Consistent Performance  X Inconsistent Performance
X Self Limiting Behavior

(Emphasis in original.)

114.    Mr. Marcotte's findings penalized Mr. Stokes for limiting his activity on the FCE,

even though Dr. Cohen specifically informed CIGNA, Connecticut General and

HealthSouth that Mr. Stokes must be able to limit his activity due to the negative

impact on his health.

115.    Following the examination, Mr. Stokes wrote Mr. Marcotte, noting in relevant

part:

While I have not seen a report and do not know the findings of this examination, I wanted to let you know how the tasks and exercises affected me both during and following the examination period. I believe that this is particularly important given that my claim is based upon the combined impact of AIDS, cardiomyopathy, chronic migraines, and the side effects of the medications I am taking to treat these diseases. These are the factors which affect my overall ability to function in an efficient manner as is necessary to maintain a dependable schedule of hours for any

job whatsoever. My ability to walk, type, sort, squeeze, lift, bend, crawl or climb for a few minutes at a time in and of themselves may not capture this effect.

Following the two and a half hour appointment on Tuesday, April 20, I went home and took a nap from 3:30 p.m. until 5:30 p.m., even after having slept for 11 hours the night before the examination began. After a restless night of sleep Tuesday night, due in part to diarrhea, upset stomach and headache, I was exhausted when I returned to complete the examination on Wednesday, April 21 at 12 noon. While I did my best to complete each task as requested, I know that my performance on Tuesday was better than my performance on Wednesday. Following Wednesday's appointment, I returned home and slept for four hours.

When I was undertaking the examination, one of the factors that made it possible to complete the individual tasks was my knowledge that it was for a limited duration and would be over soon. Trying to translate that experience into a day-to-day work environment with my situation seems difficult, without understanding the effects the FCE had on my overall health. Even the most sedentary task, sitting at a desk and typing, is not one that I could sustain for a length of time necessary to support employment.

This disability review process has been exhaustive and exhausting. No one person can determine my abilities in a couple of hours over a couple of days. While I appreciate how an FCE can be helpful in determining the status of someone whose disability was due to a shoulder or back injury, I unsure as to how this is relevant to my situation. In any case, I wanted to share my thoughts with you, and let you know more about my overall experience.

116.    Following the FCE, Ms. Nicholls wrote a report summarizing her observations of

the FCE and Mr. Stokes' limitations and restrictions. For example, Ms. Nicholls'

stated in her report:

Client [Mr. Stokes] continued to type at a rate of about sixteen words a minute. He stated that he could continue this for a while, but in about twenty minutes, would get tired. He described what he was doing as being, "pretty pedantic." If he had to think or interact, it would be more draining. He added that his frustration was not knowing on what days he will feel well. . . Client stated that sitting in the chair he was in made his left leg fall asleep. He stretched out the leg to wake it up. . . Client stated that he was getting mentally tired. At first he found the typing to be easy,